**FIRST DIVISION
BARNES, P. J.,
GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed. Please refer to the Supreme Court of Georgia Judicial Emergency Order of March 14, 2020 for further information at (https://www.gaappeals.us/rules).**

**April 27, 2020**

# In the Court of Appeals of Georgia

A20A0271. PAULEY v. THE STATE.
A20A0272. PAULEY v. THE STATE.

GOBEIL, Judge.

Lester Owensby Pauley was charged in two separate indictments with several offenses involving multiple women. Both Pauley and the State consented to joining the cases for trial. Following a jury trial, Pauley was convicted of rape, three counts of aggravated assault, and false imprisonment for crimes involving T. T.; kidnapping, rape, aggravated sexual battery, false imprisonment, and terroristic threats with respect to his ex-wife, L. C.; and kidnapping, rape, aggravated battery, false imprisonment, and terroristic threats related to another ex-wife, M. W. Pauley filed a motion for new trial, which the trial court denied. On appeal, Pauley asserts that: (1) there was insufficient evidence to sustain any of his three rape convictions; (2) there

was insufficient evidence to support his conviction for aggravated sexual battery as to L. C.; (3) the State was barred from prosecuting certain counts related to M. W. due to the expiration of the applicable statute of limitation; and (4) his trial counsel rendered ineffective assistance in multiple ways. For the reasons that follow, we conclude that trial counsel rendered ineffective assistance by failing to timely challenge that four of the five[1] counts in the indictment relating to M. W. — kidnapping, aggravated battery, false imprisonment, and terroristic threats — were barred by the applicable statute of limitation. We therefore reverse these four convictions. We affirm all of Pauley's remaining convictions.

> On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and the defendant no longer enjoys a presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility.

*Williams v. State*, 333 Ga. App. 879, 879 (777 SE2d 711) (2015) (citation and punctuation omitted). So viewed, the evidence shows that M. W. met Pauley in February 2008 and married him a few months later on August 1, 2008. M. W.

---

[1] As we later explain, because the indictment was timely filed within the 15-year statute of limitation applicable to the rape count involving M. W., Pauley's trial counsel necessarily was not ineffective for failing to challenge this count.

previously had been married for 43 years prior to her late husband's death in 2007. Prior to marrying Pauley, M. W. described that their relationship "wasn't a very good relationship," and there were several times when Pauley "forced himself on [M. W.]" When M. W. tried to resist Pauley's attempts to force her to have sex, Pauley would respond: "I'm a young man and I'm not going to do without sex[.]" Pauley insisted M. W. sleep in the nude and demanded sex every night contrary to her wishes.

Although there were times that the couple engaged in consensual sex, Pauley also forced M. W. to have sex against her will. In one specific incident, M. W. recalled that she was on the couch in the living room when Pauley forced her perform oral sex while he "held [her] down" and "manhandled [her]." M. W. tried to get her cell phone, but Pauley grabbed the phone first and "put it down" her throat, and then he raped her. M. W. recalled that Pauley told her not to fight him while he had her head turned as he could "snap [her] neck just like that." M. W. was "choking and coughing[,]" and "feared for [her] life at that time." After he raped her, Pauley took the phone out of M. W.'s mouth. She described the encounter was "a terrible, terrible, horrible experience[,]" and she would not "want anyone else to ever have to go through that." M. W. explained that she never told anyone what was happening in the relationship because she was ashamed and embarrassed and had always thought of

3

herself as an intelligent woman. M. W. also was afraid to leave Pauley because she did not know what he would do if he found her, and he had previously threatened her family. In one instance, when Pauley pushed M. W. down to the floor, M. W. managed to call law enforcement and she later attempted to apply for a temporary restraining order for physical abuse, but she did not report being raped.

On yet another occasion, M. W. described that Pauley dragged her from the bedroom to the back door and pulled off her pants and panties and raped her. Pauley then grabbed her hair and dragged her to the kitchen door and threatened to put her out without any clothes on, but then said "nah, I think I'll keep you a while longer[.]" Pauley dragged M. W. by the hair to the bedroom after she threatened to leave him. She fought back, tried to keep her legs together, and held on to her pants, but Pauley "turned that waistband inside out, ripped it loose from the — where it was sewed down, getting it off of [M. W.] And he raped [M. W.]"

In August 2008, after Pauley tried to force her to have sex again, M. W. was able to get to her cell phone and call 911 for assistance in leaving the house. When the officers arrived, they made Pauley move his truck so that M. W. could leave. This marked the end of the marriage and M. W. went to court to get a restraining order against Pauley and then filed for a divorce. However, M. W. did not report to

4

authorities that Pauley had sexually abused her until late 2014. She explained that she had not filed charges earlier because she felt ashamed.

L. C. first met Pauley on April 21, 2014 and they were married the next day and moved in together. Prior to meeting Pauley, L. C. had not been in a relationship for 21 years. L. C. described that the couple's sex life was "abnormal," and initially they only engaged in oral sex because "[Pauley] couldn't do nothing." The couple started out having consensual sex but then Pauley started to force L. C. to have sex with him. Pauley would spit tobacco juice "up in" L. C. every time the couple had sex. L. C. "was scared of [Pauley] really and [she] was afraid to say anything so he just done what he wanted to do. Then [she would] have to roll over and he'd do it from the back[.]" On one occasion, Pauley forced L. C. to have sex in his truck. Another time, Pauley put a screwdriver into L. C.'s anus even though she told him that she did not want to have sex with him and it hurt. L. C. noted, "[h]ow are you going to fight a man off that weighs 280 pounds?" Another time, after L. C. refused to have sex with Pauley, he dragged her to the bedroom and forced her to take off her clothes and walk around nude. He then got on top of her and broke her ribs and she told him to get off her because she could not breathe. Often times, Pauley would force L. C. to sit on his lap nude and then he would either drag her to the couch or the bedroom "and he just

5

done what [he] wanted to." L. C. did not fight back because she was afraid of Pauley and he warned her that he would kill her if she tried to leave or hire a hitman. Pauley also had a gun in every room and threatened to shoot L. C. if she tried to touch his wallet. L. C. lived with Pauley for about six weeks after they got married until she finally left him. She later took out a temporary restraining order on Pauley and divorced him in 2014.

T. T. met Pauley in the summer of 2014 through a friend, and he offered her a place to stay in his house. In return, she would buy groceries, cook, and take care of the house. Prior to meeting Pauley, T. T. had developed an addiction to painkillers, and she lived in a shack behind a house where she had access to drugs. T. T. indicated that she never planned to take Pauley as a boyfriend. A few months after she moved in, Pauley started to try to control her and "make [her] his woman[.]" The couple had sex, and T. T. indicated that she did not fight Pauley, but "he knew [she] didn't want to." T. T. noted that when the couple had sex, "[Pauley] would have trouble. He would have to try to get it there and then work on it to try to get it to where it would go in there." Pauley told T. T. that he wanted to marry her, but T. T. refused his proposal and the two never married.

T. T. started to fear Pauley because if the couple had a disagreement, he would pick her up and choke her until she would pass out. On one occasion, Pauley forced her to perform oral sex on him in the living room, but she was unable to do so and Pauley was unable to get an erection. Pauley then grabbed a gun and forced her to go to the bedroom. T. T. described that "[t]he sex was different. He — he was holding the headboard of the bed and he had [her] legs thrown up and he was screaming help me, [T. T.], help me[.]" Pauley "couldn't do what he needed to do . . . [h]e couldn't come." Pauley then beat T. T. with his fists, causing injuries to her face. T. T. begged Pauley to stop and told him that he was hurting her.

In late November 2014, T. T. left Pauley's house because she "felt that he was fixing to do something very serious to [her]." T. T. then called a friend to come and pick her up. The following day, Pauley pulled up outside where T. T. was staying, got out of his truck, grabbed her by the throat, and started choking her. He "slung [her] around" and kidnapped her dog. T. T.'s friend called the police and T. T. was able to recover her dog.

Based on the foregoing, a Floyd County grand jury returned an indictment in February 2015, charging Pauley with the following crimes involving T. T. in case no. 15-cr-00239: rape (Count 1), aggravated assault with intent to rape (Count 2), false

7

imprisonment (Count 3), aggravated assault with a firearm (Count 4), and aggravated assault by choking (Count 5). Subsequently, in May 2015, a Floyd County grand jury returned a separate indictment in case no. 15-cr-01160 charging Pauley with the following offenses involving L. C.: kidnapping (Count 2), rape (Count 3), aggravated sexual battery (Count 4), false imprisonment (Count 5), and terroristic threats (Count 6); and the following charges with respect to M. W.: kidnapping (Count 7), rape (Count 8), aggravated battery (Count 9), false imprisonment (Count 10), and terroristic threats (Count 11).[2]

At trial, in addition to testimony from all three victims, L. C., M. W., and T. T., a sexual assault nurse testified that she performed an examination on T. T. in November 2014, soon after Pauley choked and beat her on the street. The nurse described T. T. as "quiet, shaking, anxious, tearful." The examination revealed that T. T. had multiple bruises on her left arm and her lower legs, and the skin around her pelvic area was extremely raw and excoriated. T. T. described to the nurse that Pauley had carried her to the bedroom from the kitchen, pinned her down, taken off her pants, "and then he did what he was going to do and finished and got up." Based on

_____

[2] Pauley also was indicated on a kidnapping charge involving a fourth victim (Count 1). However, the jury found Pauley not guilty on this charge, and it is not at issue in the instant appeals.

8

her training, experience, and examination of T. T., the nurse opined that T. T.'s injuries could be consistent with a sexual assault, but they "could be consistent with several different things[,]" such as patients who are paralyzed or immobile and not cleaned properly after they urinate or defecate. In this case, however, the nurse observed that T. T. could walk and take care of herself, and thus, her injuries were likely the result of sexual assault, where the skin in the pelvic area is stretched beyond elasticity and then the drainage can cause excoriation.

Brooke Atkinson, a former investigator with the Forsyth County Sheriff's Office, testified about her experience investigating domestic violence and sexual violence crimes against women. Although not involved in investigating Pauley's case, Atkinson was retained by the State to review the records and the victims' statements about the crimes. Atkinson described the cycle of domestic violence, including the way power and control are wielded by abusers over victims, why victims are reluctant to report domestic violence, and why they stay with their assailants for a prolonged period before finally leaving. In this case, Pauley sought out victims who had a vulnerability that was easy to exploit, such as being lonely or needing a place to stay. Atkinson noted that it is not uncommon for victims of domestic sexual violence to delay reporting to law enforcement, or to not report their ordeal at all. Based on her

review of case, Atkinson opined that the victims' statements were consistent with those of domestic and sexual violence victims.

Chris Fincher, an investigator with the Floyd County Police Department, testified that he responded to a report of an altercation in the road on November 24, 2014. T. T. reported that she had been sexually assaulted over a period of days, and Fincher referred her to a sexual assault center. Investigator Fincher went to the hospital and interviewed T. T. about her rape allegations against Pauley and eventually charges were filed against Pauley. During the course of his investigation, Investigator Fincher learned about Pauley's ex-wives, M. W. and L. C., and after locating them and interviewing them, additional charges were brought against Pauley.

Pauley testified in his own defense. He described that in 1976, he was injured while operating a machine, which "crushed [his] testicles." Since then, Pauley has been unable to get a full erection. Pauley stated that he had sex with M. W. two or three times a week, but Pauley was unable to get a full erection, but rather a "so-so" erection. Nevertheless, Pauley described that the couple had a consensual sex life. Pauley denied raping M. W. or physically abusing her in any way. With respect to T. T., Pauley described that they had sex three or four times a week during the course of their three-month relationship. Pauley maintained that he could not "complete an

erection" without a woman's assistance. He insisted that although he keeps several guns in his house, he never pointed a gun at any of the victims. He also denied raping any of the women and described the victims' allegations as "baloney" and a "bunch of lies." He challenged why M. W. had waited several years to report her allegations of rape and other instances of physical abuse.

The jury found Pauley guilty of all charges involving M. W., L. C., and T. T. Pauley filed a motion for new trial, as amended, which the trial court denied following a hearing. The instant appeals followed.

1. Pauley challenges the sufficiency of the evidence to sustain his rape convictions with respect to T. T., L. C., and M. W.

As relevant here, OCGA § 16-6-1 (a) (1) provides that:

A person commits the offense of rape when he has carnal knowledge of . . . [a] female forcibly and against her will[.] Carnal knowledge in rape occurs when there is any penetration of the female sex organ by the male sex organ. The fact that the person allegedly raped is the wife of the defendant shall not be a defense to a charge of rape.

On appeal, Pauley contends that in order to support a conviction for rape, "there must be carnal knowledge, which requires penetration of the female sex organ by the male sex organ." He argues that there was no evidence to establish that he

11

successfully penetrated any of the three victims. Specifically, he highlights that: (1) T. T. described that "the sex was different," and "[Pauley] couldn't do what he needed to do[,]" (2) L. C. testified that when she first married Pauley, their sex life was not normal and the couple only engaged in oral sex because "[Pauley] could not do anything[,]" and (3) although M. W. described having "sex" with Pauley, she never gave any indication whether this term involved the penetration of the vagina or was used in "the broadest sense of the term."

In the first instance, we note that "[t]he testimony of a single witness is generally sufficient to establish a fact." OCGA § 24-14-8. See *Garner v. State*, 346 Ga. App. 351, 355 (1) n.12 (816 SE2d 368) (2018) (victim's testimony alone is sufficient to support a conviction of rape, and corroborating evidence is not required). Here, each of the victims unequivocally testified that Pauley forced them to have sex against their will. Specifically, M. W. testified that there were several times when Pauley "forced himself on [her][,]" and although there were times that the couple engaged in consensual sex, there were times Pauley forced M. W. to have sex against her will. In one specific incident, M. W. recalled that Pauley held her down and stuffed a cell phone down her throat and then raped her. On another occasion, M. W. described that Pauley dragged her from the back door to the bedroom and pulled off

12

her pants and underwear and raped her. Pauley also dragged M. W. by the hair to the bedroom after she threatened to leave him, ripped off her pants and "he raped [M. W.]" L. C. also testified that she initially engaged in consensual sex with Pauley, but then he started to force her to have sex with him. She described that she "was scared of [Pauley] really and [she] was afraid to say anything so he just done what he wanted to do." Finally, T. T. testified that she had sex with Pauley and she noted that she did not fight Pauley, but "he knew [she] didn't want to."

Moreover, at trial, Pauley admitted that he had sex with M. W. two or three times a week, and also described that he had sex with T. T. three or four times a week during the course of their three-month relationship, without raising any challenge as to whether he was able to successfully penetrate the victims. Although Pauley argues that he was unable to maintain a full erection without a woman's assistance, he did state that he was able to achieve a "so-so" erection. Notably, only slight penetration is necessary to support a rape conviction. See *Mayes v. State*, 336 Ga. App. 55, 58 (1) (783 SE2d 659) (2016) (evidence that victim's underwear and tampon had been removed and her vagina was sore was sufficient for rational trier of fact to find beyond a reasonable doubt that penetration had occurred); *Richie v. State*, 183 Ga. App. 248, 249-250 (1) (358 SE2d 648) (1987).

13

To the extent that there was inconsistent testimony at trial, "[r]esolving evidentiary conflicts and inconsistences and assessing witness credibility are the province of the fact finder, not the appellate court." *McNeely v. State*, 296 Ga. 422, 425 (1) (768 SE2d 751) (2015) (citations and punctuation omitted). Based on the foregoing, we conclude there was sufficient evidence to support Pauley's convictions for rape with respect to all three victims.

(2) Pauley also challenges the sufficiency of the evidence to sustain his conviction for aggravated sexual battery with respect to L. C. That count charged that Pauley "did unlawfully . . . [and] intentionally penetrate the anus of [L. C.] with a foreign object, to wit; a screwdriver without the consent of said person[.]" On appeal, Pauley asserts that the State failed to meet its burden to show that he penetrated L. C.'s anus with a screwdriver or that L. C. did not consent to the conduct at issue.

Under OCGA § 16-6-22.2 (b), "[a] person commits the offense of aggravated sexual battery when he or she intentionally penetrates with a foreign object the sexual organ or anus of another person without the consent of that person." The statute defines "foreign object" as "any article or instrument other than the sexual organ of a person." OCGA § 16-6-22.2 (a). "Lack of consent may be proved by means other than an unambiguous verbal statement to the accused." *Chester v. State*, 328 Ga. App.

14

888, 889 (1) (763 SE2d 272) (2014). And the question of whether a victim consented to the sexual contact is for the jury. Id.

At trial, the State queried L. C. on whether she recalled an incident at a weigh station involving a screwdriver. Initially, L. C. responded that the incident occurred at home, but then she recalled that she had told Investigator Fincher during the course of the investigation that the incident took place at a weigh station. L. C. then described that while the couple was parked at a weigh station, Pauley forced her into the sleeper cabin of truck and inserted a screwdriver into her anus even though she told him that she did not want to have sex with him and it hurt. Specifically, she noted that "[Pauley] weighed 280 pounds" and she lacked the ability "to fight a man off that weighs 280 pounds[.]" This evidence is sufficient to satisfy the elements of aggravated sexual battery. OCGA § 16-6-22.2 (b); see also *Tinson v. State*, 337 Ga. App. 83, 85 (1) (785 SE2d 914) (2016) ("Georgia law does not require corroboration of a sexual crime victim's testimony.").

Pauley also asserts that the State failed to prove the essential element of venue beyond a reasonable doubt with respect to the screwdriver incident. We are not persuaded. "[V]enue is a jurisdictional fact the State must prove beyond a reasonable doubt in every criminal case." *Worthen v. State*, 304 Ga. 862, 865 (3) (a) (823 SE2d

15

291) (2019) (citation and punctuation omitted). The State may meet this burden using either direct or circumstantial evidence. Id. "[T]he determination of whether venue has been established is an issue soundly within the province of the jury." Id. (citation and punctuation omitted).

At trial, L. C. testified that the screwdriver incident occurred either in Pauley's home or a weigh station. Investigator Fincher with the Floyd County Police Department later testified that:

> [L. C.] told [him] that [Pauley] asked [L. C.] to go with him on a trip. She rode with him. At some point they went to Inland Container, the paper company out in Coosa [in Floyd County] . . . . There was apparently a line [at the weigh station] so they pulled over. At that point Mr. Pauley told her that he demanded sex and that they – that they were going to have sex, that he – at that time he had a screwdriver and that he penetrated her anus with the screwdriver.

Investigator Fincher also recalled that L .C. described other instances of forced sex at Pauley's home located on Fannin Street in Floyd County.

Although Pauley takes issue with the clarity of some of the testimony offered to establish venue, "[i]t is the function of the jury, not the court, to determine the credibility of witnesses and to weigh and resolve any conflicts in the testimony." *Rowland v. State*, 349 Ga. App. 650, 651 (1) (825 SE2d 231) (2019) (citation and

16

punctuation omitted). And our Supreme Court recently has held that "like any other fact, venue may be proved by circumstantial evidence, and it is enough if the fact of venue is properly inferable from all the evidence." *Worthen*, 304 Ga. at 871 (3) (e) n. 6 (citation and punctuation omitted). Based on the record before us, we find the jury was authorized to conclude the charged offense occurred either in Pauley's home or the weigh station, both of which are located in Floyd County. See *Faust v. State*, 303 Ga. 731, 736 (2) (814 SE2d 714) (2018) (venue in DeKalb County proved beyond a reasonable doubt based in part on evidence that investigation was led by DeKalb County police). Accordingly, this enumeration of error provides no basis for reversal.

3. Pauley asserts that the State erred in prosecuting him on four of the counts related to M. W., kidnapping, aggravated battery, false imprisonment, and terroristic threats, because they are barred by the applicable statute of limitation. Pauley first raised this issue in his motion for new trial. Following a hearing, the trial court denied Pauley relief, concluding "[t]he other evidence as to when certain acts occurred was in conflict. [Pauley] himself testified that his contact with each victim fell well within the period of any applicable limitation period." As a threshold matter, we must determine whether Pauley preserved this issue for appellate review.

17

The record shows that, on May 29, 2015, a grand jury indicted Pauley for kidnapping, rape, aggravated battery, false imprisonment, and terroristic threats for crimes involving M. W. in Counts 7 through 11. The indictment alleged that each of the listed crimes occurred on August 5, 2008 with "said offense[s] unknown to the State and the Grand Jury prior to November 1, 2014[.]" On appeal, Pauley argues that the charges of kidnapping, aggravated battery, false imprisonment, and terroristic threats should have been filed within four years of the commission of those crimes in 2008. See OCGA § 17-3-1 (c) (generally, prosecutions for felonies not punishable by death or life imprisonment must commence within four years after the commission of the crime). Because the indictment was not filed until 2015, Pauley asserts that the indictment is defective and these convictions should be reversed.[3]

> A challenge to an indictment is typically made through a demurrer to the indictment. A demurrer to an indictment may be general or special. A general demurrer challenges the very validity of the indictment and may be raised anytime; the special [demurrer] objects merely to its form or seeks more information and must be raised before pleading to the indictment. . . . [B]ecause a general demurrer attacks the legality of an indictment, it is permissible to raise this ground after verdict by a motion

---

[3] We address Pauley's ineffectiveness-of-counsel claim with respect to counsel's failure to raise the statute of limitation issue before or during trial in Division 4 (d) of this opinion.

18

in arrest of judgment even if there was no earlier objection. . . . A motion in arrest asserts that the indictment contains a defect on its face affecting the substance and real merits of the offense charged and voiding the indictment, such as failure to charge a necessary element of a crime. . . .

A motion for directed verdict of acquittal is not the proper way to contest the sufficiency of an indictment. A motion for a directed verdict of acquittal addresses the sufficiency of the evidence, not the sufficiency of the underlying indictment. When an indictment is absolutely void . . . and, upon the trial, no demurrer to the indictment is interposed and the accused is convicted under the indictment and judgment is entered on the verdict, the accused's proper remedy is a motion in arrest of judgment or habeas corpus.

[Moreover, a] *motion for new trial is not the proper method to attack the sufficiency of an indictment and does not provide a basis for this Court to review the indictment.*

Based on the above, it is clear that objections to defects in an indictment can be waived, except when the defects are so great that the accusation is absolutely void. However, when a claim that an accusation or indictment is absolutely void is not properly asserted in the trial court, it can be reviewed on appeal only through a habeas corpus proceeding.

*McKay v. State*, 234 Ga. App. 556, 558-560 (2) (507 SE2d 484) (1998) (citations and punctuation omitted; emphasis supplied).

19

In this case, the record contains no indication that Pauley filed a general demurrer or a motion in arrest of the judgment in order to challenge the statute of limitation with respect to the charges involving M. W.[4] As a result, Pauley's challenge to the statutes of limitation with respect to the charges involving M. W. is not properly before us. See *McKay*, 234 Ga. App. at 559-560 (2). "The issue of whether the indictment underlying [Pauley's] conviction[s] was void must await determination until such time as [Pauley] avails himself of the proper procedure for attacking the conviction[s] on that basis." Id. at 560 (2) (citation and punctuation omitted).

Next, Pauley argues that the trial court erroneously instructed the jury[5] on the rape charge by stating that (1) a prosecution for rape carries a seven year statute of limitations, and (2) the period of limitation does not include any time periods in

---

[4] At the close of the State's case, Pauley moved for a directed verdict on all charges on "general grounds," which the trial court denied. However, Pauley did not raise any objections with respect to the statutes of limitation having run on the charges involving M. W.

[5] Because Pauley did not object to this issue below — a finding he does not contest on appeal — the contested jury charge is subject to review on appeal for "plain error which affects [his] substantial rights." OCGA § 17-8-58 (b).

which the crime is unknown to the State. As relevant here, the trial court charged the jury as follows:

> Charges have to be brought within a period of the statute of limitations. In the case of the charges in this – all of the charges in both indictments, two of those charges, rape and aggravated sexual battery, have a seven-year statute of limitations. All the other charges have a four-year statute of limitations. . . . [T]he indictment must have been filed within four years or seven years of the date the offense occurred. But the date in the count of the indictment itself is not a material element of the charge.

> The State simply has to prove beyond a reasonable doubt that the offense occurred within the period of the statute of limitations. So you count backwards from the date the indictment was filed. Seven years for rape, aggravated sexual battery, four for all the others. Now that becomes important as to the last five counts of the second indictment. . . . [T]hose are the counts that refer to something having occurred in the year – the 5th of August 2008. Okay. And I told you what the statute of limitations is.

> There's an exception to the statute of limitations and here's what it is. The period of time within which a prosecution must be commenced, that is the date of the indictment, does not include any period in which the person committing the crime is unknown or the crime, itself, is unknown to the State. Okay.

21

So should you find that the State was unaware of the existence of the crimes as it's charged in those last five counts, seven through eleven, and was not aware of such – the existence of such – that crimes had even been committed until a period of time within the period of the statute of limitations, within four or seven years prior to the date of the indictment. Then the statute of limitations would not have run as to those charges. Okay. That's a lot to get on you before we even get started with the other.

At trial, M. W. testified that she first met Pauley in February 2008 and married him a few months later in August 2008. She eventually left him in August 2008 after calling the police for assistance. As a result, the rape incidents involving M. W. occurred within this six-month time frame, including while the couple was married, and in August 2008 at the latest. Although almost seven years had passed between the date the crimes were committed in 2008 and the filing of the indictment in May 2015, the indictment was timely filed within the fifteen-year statute of limitation period for the rape charge. See OCGA § 17-3-1 (b) ("[P]rosecution for the crime of forcible rape shall be commenced within 15 years after the commission of the crime."). Although the trial court erroneously instructed the jury on the applicable statute of limitations for rape, the error was actually beneficial to Pauley because the erroneous charge held the State to a higher burden to show that it commenced prosecution within seven

22

years, as opposed to fifteen years. As such, Pauley's contention of error with respect to the rape jury charge is without merit.

4. Pauley asserts that he received ineffective assistance of trial counsel. To prevail on this claim, Pauley "must prove both that his trial counsel's performance was deficient and that there is a reasonable probability that the trial result would have been different if not for the deficient performance." *Brewer v. State*, 301 Ga. 819, 821 (3) (804 SE2d 410) (2017) (citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984)). If an appellant fails to satisfy either prong of this test, we need not examine the other prong. *Wright v. State*, 291 Ga. 869, 870 (2) (734 SE2d 876) (2012).

> (W)hile other counsel, had they represented [Pauley], may have exercised different judgment, the fact that trial counsel chose to try the case in the manner in which it was tried, and made certain difficult decisions regarding the defense tactics to be employed with which [Pauley] . . . [later disagreed], does not require a finding that the representation below was so inadequate as to amount to a denial of effective assistance of counsel.

*Reed v. State*, 285 Ga. 64, 66-67 (6) (673 SE2d 246) (2009) (citations and punctuation omitted). Rather, to show deficient performance,

[Pauley] must demonstrate that counsel's performance was not reasonable under the circumstances confronting counsel at the time, without resorting to hindsight. Rather than focusing on what [the additional evidence] would have shown had it been sought, the proper emphasis is on whether counsel's actions, under the circumstances then existing, were reasonable.

*Belton v. State*, 270 Ga. 671, 673 (3) (512 SE2d 614) (1999) (citations and punctuation omitted). In reviewing counsel's performance on appeal, "we must apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Hardin v. State*, 344 Ga. App. 378, 381 (1) (810 SE2d 602) (2018) (citation and punctuation omitted).

(a) In two interrelated claims, Pauley asserts that his trial counsel was ineffective for failing to object to testimony from Atkinson, a former investigator with the Forsyth County Sheriff's Officer.

First, Pauley asserts that Atkinson offered testimony beyond the scope of a lay witness and she was never properly tendered as an expert witness. The admissibility of expert witnesses in criminal cases is governed by OCGA § 24-7-707, which provides that "[i]n criminal proceedings, the opinions of experts on any question of science, skill, trade, or like questions *shall always be admissible*; and such opinions

24

may be given on the facts as proved by other witnesses." (emphasis supplied). "To qualify as an expert generally all that is required is that a person must have been educated in a particular skill or profession; [her] special knowledge may be derived from experience as well as study[.]" *Kruel v. State*, 344 Ga. App. 256, 260 (3) (809 SE2d 491) (2018) (citation and punctuation omitted). "The trial court has broad discretion in accepting or rejecting the qualifications of the expert[.]" Id. (citation and punctuation omitted).

Here, Atkinson testified at trial that she was a former investigator with the Forsyth County Sheriff's Office, during which she "actively participate[d]" in investigations involving domestic violence and sexual violence against women. Based on her training, she authored the Forsyth County Sheriff's Office's training program for domestic violence. This testimony as to her credentials laid an adequate foundation for her to testify about the cycle of domestic violence, including the way power and control are wielded by abusers over victims, why victims are reluctant to report domestic violence, and why they stay with their assailants for a prolonged period before finally leaving. See *Rodriguez v. State*, 281 Ga. App. 129, 131-132 (2) (635 SE2d 402) (2006); *Hyde v. State*, 189 Ga. App. 727, 728-729 (1) (377 SE2d 187) (1988). Pauley has pointed to no evidence affirmatively showing that Atkinson

25

was not qualified to give opinion testimony about victims of domestic violence and sexual assault. Pauley, therefore, cannot show that his trial counsel's conduct constituted deficient performance. See *Robbins v. State*, 290 Ga. App. 323, 331 (4) (d) (659 SE2d 628) (2008) (trial counsel cannot be deemed ineffective for failure to make a futile or meritless objection).

Next, Pauley asserts that trial counsel was ineffective for not objecting to Atkinson's testimony that Pauley fit the profile of a perpetrator of sexual assault, thereby placing his bad character into evidence in violation of OCGA § 24-4-404 (a). Generally, "[e]vidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion." OCGA § 24-4-404 (a). Although not involved in investigating the case, Atkinson was retained by the State to review the records and the victims' statements about the crimes. She described the factors common to the crimes against each of Pauley's victims, including sexual violence, such as choking, Pauley's need to have a sense of power and control, and his entrapment of the victims. The following exchange then took place between the State and Atkinson:

> State: [A]re you also familiar with general traits of somebody who participates as the offender in domestic and sexual violence case[s]?

Atkinson: Yes.

State: All right. And what traits did you find based on the descriptions given by the victims in this case of Lester Pauley that made him consistent as a – as a[n] offender of domestic and sexual violence?

Atkinson: Okay. Individuals who commit domestic violence come from all walks of life. Usually it's related to an internal lack – a sense – a sense of internal lack of power that relates to a desire to have power over your external environment. And so traits consistent with that are things that we typically see. Additionally, in this case there was sexual violence, and that sexual violence usually indicates that that desire, that need to have that much more control. Unfortunately, to some degree that power is what's needed to have that sexual excitement.

Contrary to Pauley's assertion, Atkinson never commented directly on his character or propensity to commit sex crimes. Rather, she provided a general opinion about traits common to individuals that commit domestic violence and sexual crimes and the sexual violence faced by each of Pauley's victims. As a result, Pauley necessarily fails to show that his counsel was deficient for failing to object to this testimony as improper character evidence.

(b) Pauley asserts that his trial counsel rendered ineffective assistance by failing to object to Investigator Fincher's testimony, as this constituted inadmissible

hearsay, and was solely introduced to bolster the victims' credibility. We discern no such error.

"It is well established that credibility of a witness is a matter for the jury, and a witness's credibility may not be bolstered by the opinion of another witness as to whether the witness is telling the truth." *Alford v. State*, 320 Ga. App. 523, 528 (2) (c) (738 SE2d 124) (2013) (citation and punctuation omitted). Pauley complains that Investigator Fincher was allowed to sit in the courtroom during the victims' testimony, and the sole purpose of his testimony was "merely to give a recitation of the witnesses' testimony, to explain how it is similar to what they told him during his investigation, and how they were consistent with each other, all in attempts to bolster the witnesses' testimony." Specifically, at trial, Investigator Fincher commented, after being allowed to remain in the courtroom during the victims' testimony, that the witnesses' pretrial interviews essentially mirrored their trial testimony, and "[s]o for them to tell the same story over and over again was – it was corroborating evidence for me, but it was also compelling evidence." Pauley argues that his trial counsel should have objected to these statements, asserting Investigator Fincher improperly bolstered the victims' credibility. See, e. g., *Brown v. State*, 302 Ga. 454, 460 (2) (b) (807 SE2d 369) (2017) ("OCGA § 24-6-620 says that the 'credibility of a witness

28

shall be a matter to be determined by the trier of fact . . . .' Under this rule . . . a witness, even an expert, can never bolster the credibility of another witness as to whether the witness is telling the truth. Credibility of a witness is not beyond the ken of the jurors but, to the contrary, is a matter solely within the province of the jury.") (citation and punctuation omitted).

Even if Investigator Fincher's testimony improperly bolstered the victims' credibility, however, Pauley cannot show that this testimony prejudiced him because each of the victims testified as to her version of the facts in front of the jury and was subjected to cross-examination on those facts. See *Al-Attawy v. State*, 289 Ga. App. 570, 573-574 (1) (657 SE2d 552) (2008) (defendant was not prejudiced by trial counsel's failure to object to improper bolstering testimony when, in part, the victim testified and was subject to cross-examination in front of the jury). Accordingly, this claim of ineffective assistance fails.

(c) Finally, Pauley argues that to the extent his statute of limitation defense was waived with respect to the charges of kidnapping, aggravated battery, false imprisonment, and terroristic threats involving M. W., based on the lack of a timely challenge to the indictment, as we found in Division 3, his trial counsel rendered

29

ineffective assistance by failing to preserve this issue.[6] Pauley raised this issue in the context of his ineffective assistance claims in his motion for new trial.

> A motion in arrest of judgment or habeas corpus are the only remedies available when no demurrer to the indictment is interposed before judgment is entered on the verdict. Therefore, a motion for new trial is ordinarily not the proper method to attack the sufficiency of the indictment. But, this Court has made an exception [in cases such as this one] when the motion for new trial raises the ground of ineffective assistance of counsel.

*Harris v. State*, 258 Ga. App. 669, 671 (1) (574 SE2d 871) (2002) (citations omitted).

As the State concedes, "there may be legitimate issues regarding at least some of the other crimes in which [M. W.] was the victim[.]" Specifically, as relevant here, the charges of kidnapping, aggravated battery, false imprisonment, and terroristic threats carry a four-year statute of limitation. See OCGA § 17-3-1 (c) (generally, prosecutions for felonies not punishable by death or life imprisonment must commence within four years after the commission of the crime); OCGA § 16-5-40 (d) (1) (as relevant here, the maximum term of imprisonment for kidnapping involving

---

[6] At the motion for new trial hearing, trial counsel stated that he did not "see any statu[t]e of limitation[] issue that [he] felt could have potentially been raised in [Pauley's] case[,]" but he conceded that he should have "been more aggressive on the statute of limitation[] question."

30

a victim 14 years or older is 20 years); OCGA § 16-5-24 (b), (g) (maximum sentence for conviction for aggravated sexual battery is 20 years); OCGA § 16-5-41 (b) (maximum term of imprisonment for the crime of false imprisonment is ten years); and OCGA § 16-11-37 (d) (maximum possible sentence for a conviction for making terroristic threats is 40 years).

As previously stated in Division 3, the indictment alleged that these four crimes occurred on August 5, 2008, but the indictment was not filed until May 2015, after the expiration of the four-year limitation period outlined in OCGA § 17-3-1 (c). It is axiomatic that the statute of limitation period for charging an individual for a crime begins running at the time of the criminal act. *Martinez v. State*, 306 Ga. App. 512, 522 (2) (702 SE2d 747) (2010). Thus, the State must file an indictment charging the accused with the offense within the applicable statute of limitation period for that crime. See *State v. Godfrey*, 309 Ga. App. 234, 239 (2) (709 SE2d 572) (2011) ("Because the State failed to indict [the defendant] within the applicable limitation period, the trial court did not err in granting [the defendant's] plea in bar to dismiss [the counts at issue].").

Under certain circumstances, however, the State may file an indictment after the statutory limitation period for the alleged crime has expired. See, e. g., *Jannuzzo*

*v. State*, 322 Ga. App. 760, 761 (746 SE2d 238) (2013); *Moss v. State*, 220 Ga. App. 150, 150 (469 SE2d 325) (1996). In such cases, the State must specifically allege in each count of the indictment the applicable tolling provision or exception to the statute of limitation in order to show that the charged offense is not time-barred. See *Jannuzzo*, 322 Ga. App. at 765 (2) ("Where an exception is relied upon to toll the statute of limitation, it must be alleged in the indictment and proved."). As relevant here, the period within which a prosecution must be commenced under OCGA § 17-3-1 (c) does not include any period in which the person committing the crime is unknown or the crime is unknown. OCGA § 17-3-2 (2).

> The knowledge placed at issue by OCGA § 17-3-2 (2) is the knowledge of the State, which knowledge includes that imputed to the State through the knowledge not only of the prosecution, but also includes the knowledge of someone interested in the prosecution, or injured by the offense. Thus, the knowledge of a victim of a crime or of a law enforcement officer is imputed to the State.

*Duncan v. State*, 193 Ga. App. 793, 793-794 (389 SE2d 365) (1989) (citations omitted).

Here, the State included language in the indictment with respect to the relevant counts explaining that the charges were not time-barred because "said offense[s]"

32

[were] unknown to the state and the grand jury prior to November 1, 2014[.]" However, M. W. unequivocally testified that she knew that Pauley was the perpetrator of the crimes against her back in 2008. As a result, M. W.'s knowledge was imputed to the State on that date and the period of limitation commenced on this date. See *Duncan*, 193 Ga. App. at 794. The face of the 2015 indictment showed that it was filed after the expiration of the four-year statute of limitation on the kidnapping, aggravated battery, false imprisonment, and terroristic threats charges involving M. W. For that reason and since the indictment did not allege that the limitation period had been tolled, the indictment was fatally flawed as a matter of law.[7] See *State v. Barker*, 277 Ga. App. 84, 87 (3) (625 SE2d 500) (2005) (If it appears on the face of the indictment that the statute of limitation period has run, the indictment is fatally defective and subject to demurrer, unless it alleges an exception to the running of the limitation period.). As a result, because the record shows that the State failed to meet its burden to prove that these four charges were brought within the applicable statute

---

[7] To the extent that Pauley alleges that his trial counsel rendered ineffective assistance by failing to timely raise a statute of limitation issue with respect to his rape conviction involving M. W., his argument is without merit. As previously stated in Division 3, the indictment was timely filed within the 15-year statute of limitation applicable to the rape count. See *Hantz v. State*, 337 Ga. App. 675, 678 (788 SE2d 567) (2016) ("Trial counsel's failure to file a meritless motion does not amount to ineffective assistance.") (citation and punctuation omitted).

33

of limitation, trial counsel was deficient in failing to file a general demurrer or a motion in arrest in the judgment seeking to dismiss these four counts. See *Jannuzzo*, 322 Ga. App. at 766 (2) ("Because the State failed to carry its burden to prove that [the defendant] was indicted on the theft by conversion or the RICO count within the applicable statutes of limitation, the convictions must be reversed."); *Moss*, 220 Ga. App. at 150 ("The evidence shows that [the defendant] was not indicted within the statutory period, and [the defendant] properly raised the statute of limitation as an affirmative defense during the trial of the case; therefore, the trial court erred in denying [the defendant's] motion for directed verdict of acquittal."). Moreover, this deficiency prejudiced Pauley because if his counsel had timely raised the statute of limitation issue, these charges would have been dismissed. See *Scott v. State*, 305 Ga. App. 710, 716-717 (2) (a) (700 SE2d 694) (2010) ("In the context of an ineffective assistance claim, prejudice is shown by demonstrating that a reasonable probability exists that the outcome of the case would have been different but for the deficient performance of counsel.") (citation and punctuation omitted); *Barker*, 277 Ga. App. 84, 87 (3).

We therefore reverse Pauley's convictions for kidnapping (Count 7), aggravated battery (Count 9), false imprisonment (Count 10), and terroristic threats

(Count 11) involving M. W. based on the expiration of the statute of limitation. We affirm Pauley's remaining conviction for rape involving M. W. (Count 8), and also affirm all of his convictions involving T. T. and L. C.

*Judgment affirmed in part, reversed in part. Barnes, P. J., and Pipkin, J., concur.*